IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VYNEEKA HOPKINS, as Parent and Natural Guardian of C.A., a Minor | : | |
| Plaintiff. | : | CIVIL ACTION |
| | : | No. 18-5354 |
| v. | : | |
| | : | |
| NICOLE YESSER, *et. al*. | : | |
| | : | |
| Defendant. | : | |

**September 24, 2019**                                                                    **Anita B. Brody, J.**

### MEMORANDUM

Three weeks after his release from South Mountain Secure Treatment Unit ("South Mountain")—a state-run treatment facility for juvenile offenders—Defendant Jamir Hill abducted C.A., a young child, from her Philadelphia home. Hill brutally beat C.A., sexually assaulted her, and left her for dead in the tall weeds behind her home. He was later convicted of burglary, kidnapping, rape, and attempted murder. C.A.'s mother, Plaintiff Vyneeka Hopkins, brings this suit against Hill, Defendants Nicole Yesser and Rocco Manfredi (mental health workers who recommended Hill's release), and Manfredi's employer, Defendant Bonsall, Manfredi & Associates ("BMA"). Hopkins brings state-law tort claims against Hill for assault and battery. As to Yesser, Manfredi, and BMA, she brings a state-law negligence claim and a claim under 42 U.S.C. § 1983 for violation of C.A.'s substantive due process right to bodily integrity.[1]

---

[1] Federal question jurisdiction lies over the § 1983 claim under 28 U.S.C. § 1331, and supplemental jurisdiction lies over the state-law tort claims under 28 U.S.C. § 1367.

1

Before me are two motions to dismiss: one filed jointly by Manfredi and BMA (collectively, the "Manfredi Defendants") and the other filed by Yesser.[2] Both move to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3] As tragic as the facts of this case are, I must ultimately dismiss the § 1983 claim and decline to exercise supplemental jurisdiction over the remaining state-law claims.

## I.  BACKGROUND[4]

In 2014 Jamir Hill—a juvenile—was admitted into state custody and housed in South Mountain. During his time at South Mountain, Hill "was known to have violent and uncontrollable tendencies, as well as deviant sexual outbursts." Am. Compl. at ¶ 21 (ECF No. 18). The Amended Complaint does not specify why Hill was admitted to South Mountain.

While in South Mountain, Hill received treatment from Defendants Nicole Yesser and Rocco Manfredi. Yesser was Hill's assigned counselor and Manfredi was his assigned psychiatrist. *Id.* at ¶ 22.[5] Yesser was responsible for overseeing Hill's ongoing treatment and determining his capacity to be released. *Id.* at ¶ 5. Manfredi also played a "supervisory role related to [Hill's] release." *Id.* at ¶ 43.

---

[2] Hill has not filed a motion to dismiss, nor has he filed any other responsive pleadings. On March 15, 2019, the Clerk of Court entered a default against Hill pursuant to Federal Rule of Civil Procedure 55(a). ECF No. 42. On March 26, 2019, Hopkins requested that the Court enter a default judgment against Hill. ECF No. 47. As explained below, I will decline to exercise supplemental jurisdiction over the claim against Hill and will dismiss that claim without prejudice to re-filing in state court.

[3] Both motions raise absolute judicial immunity defenses. Both also moved, in the alternative, to transfer venue under 28 U.S.C. §§ 1404(a) and 1406(a). Yesser—but not the Manfredi Defendants—raised a qualified immunity defense and moved for a more definite statement under Federal Rule 12(e).

[4] All facts are taken from the Amended Complaint (ECF No. 18) and construed in the light most favorable to Hopkins. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

[5] Yesser worked for South Mountain as a Psychological Services Associate. Manfredi worked for Defendant BMA and privately contracted with South Mountain to provide psychiatric services.

At some point during Hill's time at South Mountain, Yesser and Manfredi recommended that Hill be released. The recommendations arose in "notations" made during the "ordinary course of [Hill's] treatment." *Id.* at ¶ 28. The recommendations were "not solicited or made as part of an inquiry from any court, parole board, or other such entity." *Id.* Hill was released on July 6, 2015. *Id*.

Yesser and Manfredi both knew that prior to his admission to South Mountain, Hill "was known to target young members of his family and their friends" for violence and sexual abuse. *Id.* at ¶ 24. They also knew that Hill and his family lived in "close proximity" to C.A.'s family, that the two families had frequent contact, and that Hill would return to his family's home when released. *Id.* at ¶¶ 26-27.

At the time Yesser and Manfredi recommended that Hill be released, they knew that he was still a "danger to the public" with a "high risk of recidivism." *Id.* at ¶ 23. They knew that it was "entirely foreseeable" that Hill, if released, would "engage in behaviors that threatened the safety of the community and C.A."[6] *Id*.

On July 28, 2015—about three weeks after his release—Hill abducted C.A. from her home. *Id.* at ¶ 29. He then assaulted and raped C.A., leaving her for dead in the tall weeds behind her house. *Id.* C.A. survived but suffered severe and permanent physical and psychological harm. *Id.* at ¶ 33. On May 22, 2017, Hill was convicted for burglary, kidnapping, rape, and attempted murder. *Id.* at ¶ 30.

---

[6] Hopkins's subsequent briefing asserts that Yesser and Manfredi knew that Hill *specifically intended* to attack a "young family friend" like C.A. But nothing in the Amended Complaint refers any such intent.

## II. STANDARD OF REVIEW

In deciding a motion to dismiss under Rule 12(b)(6), a court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

To survive dismissal, a complaint must allege facts sufficient to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to determine the sufficiency of a complaint under *Twombly* and *Iqbal*, a court must engage in the following analysis:

> First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013) (quoting *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir. 2011)).

## III. DISCUSSION

Hopkins brings a substantive due process claim under § 1983 and additional claims under Pennsylvania tort law. Because Hopkins does not adequately allege a substantive due process violation, her § 1983 claim must be dismissed. I will also decline to exercise supplemental jurisdiction over the remaining state-law tort claims.

## A. Substantive Due Process Claim

To state a claim under § 1983, a plaintiff must allege a deprivation of a constitutional right caused by someone acting under the color of state law. *Phillips*, 515 F.3d at 235. The Due Process Clause provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Hopkins alleges that Manfredi and Yesser deprived C.A. of her substantive due process right to bodily integrity under the Fourteenth Amendment. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Rochin v. California*, 342 U.S. 165 (1952)) (recognizing bodily integrity as a liberty interest under the Due Process Clause). No Defendants dispute Hopkins's allegation that they acted under color of state law. Rather, they argue that Hopkins did not adequately allege a constitutional deprivation.[7]

In general, the Due Process Clause imposes no duty on the state to protect its citizens from violence by private actors. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). But the Third Circuit recognizes a "state-created danger" exception to that general rule. *Kneipp v. Tedder*, 95 F.3d 1199, 1211 (3d Cir. 1996). That exception provides that "the Due Process Clause can impose an affirmative duty to protect if the state's own actions create the very danger that causes the plaintiff's injury." *Morrow v. Balaski*, 719 F.3d 160, 167 (3d Cir. 2013).

---

[7] The Manfredi Defendants move to dismiss for failure to state a claim, but do not raise a qualified immunity defense. Yesser argues that qualified immunity prevents Hopkins from being able to state a claim. It is unnecessary to address the entirety of Yesser's qualified immunity defense because, as will be explained below, Hopkins does not adequately allege a constitutional violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

To prevail on a substantive due process claim under the state-created danger theory,[8] a plaintiff must prove each of the following elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor behaved with a degree of culpability that shocked the conscience; (3) there was some relationship between the state and plaintiff that makes the plaintiff a foreseeable victim; and (4) the state-actor used his or her authority to create a danger that would not have otherwise existed had the state not acted at all. *Phillips,* 515 F.3d at 235; *L.R. v. Sch. Dist. Of Philadelphia*, 836 F.3d 235, 242 (3d Cir. 2016) (citations omitted).

The Manfredi Defendants argue that Hopkins failed to establish any of the four elements. Yesser only challenges the third and fourth elements. Because Hopkins fails to satisfy the third element, it is unnecessary to address the other three.

### 1. The "Foreseeable Victim" Element.

The third element of the state-created danger theory—the "foreseeable victim" element—asks whether there is a "sufficiently close" relationship between the state and plaintiff to make the plaintiff a "foreseeable victim of the defendant's acts in a tort sense," either "individually or as a member of a distinct class." *L.R.* 836 F.3d at 247; *Phillips*, 515 F.3d at 242; *Rivas v. City of Passaic*, 236 F.3d 181, 197 (3d Cir. 2004). The relationship may exist when the defendant has knowledge that either (1) "a specific individual has been placed in harm's way" or (2) the plaintiff "[is] part of an identifiable and discrete class of persons subject to the harm the state allegedly has created." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir. 1997). Hopkins argues that C.A. was part of a "discrete class" of victims.[9]

---

[8] Hopkins offers no theory of relief for her due process claim other than the state-created danger theory.

[9] Hopkins never alleges that Hill specifically intended to harm C.A. *individually* upon his release—or that Yesser or Manfredi knew of any such intent. She only argues that C.A. was part of a sufficiently "discrete" class of victims.

6

The "primary focus" of the third element is foreseeability. *Id.* at 913. But in the "discrete class" analysis, foreseeability by itself is not enough. In addition, the group must be limited enough to remain separate from the general public. *See id.* at 913 n.12 (emphasis added) ("[W]here the state actor has allegedly created a danger towards the public generally, . . . holding a state actor liable for the injuries of *foreseeable plaintiffs* would expand the scope of the state-created danger theory beyond its useful and intended limits.").[10] This requirement prevents the state-created danger exception from swallowing "the general rule that the state is not obligated to protect its citizens from random, violent acts of private parties." *See id.* at 913 & n.12 ("Where . . . the allegedly unlawful acts of the state actor affect only a limited group of potential plaintiffs, the potentially broad reach of the state-created danger theory is constrained . . . .").

Hopkins argues that C.A. belonged to a discrete class, which she defines as "family or friends of Defendant Hill, [who] would have regular contact with him and [who] lived in very close proximity to his home where he was to be released."[11] Am. Compl. at 6, ¶28. But that class has two fatal flaws. First, it lacks discernible limits or membership criteria. Second, it does not face a "special danger" separate from that faced by the general public.

---

[10] *See also Crockett v. Se. Pa. Transp. Ass'n*, 2013 WL 2983117, at *6 (E.D. Pa. June 14, 2013), *aff'd sub nom.*, 591 Fed. App'x. 65 (3d Cir. 2015) ("Foreseeability alone . . . is not sufficient to establish a discrete class; the plaintiff must be part of a *limited group* of potential plaintiffs.").

[11] Hopkins's definition of this class varies throughout her Amended Complaint and subsequent briefing. Elsewhere in the Amended Complaint she notes that Hill was known to target "young members of his family *and their friends*." Am. Compl. at 6, ¶24 (emphasis added). In her briefing, Hopkins defines the group as "young *female* family friends" who live close to Hill's mother, Pl.'s Resp. to Yesser's Mot. to Dismiss, at 13 (ECF 33) (emphasis added), but nothing in the Amended Complaint imposes a gender-based limit. No matter the precise formulation of the class, however, the result is the same: Hopkins fails to provide discernible limits or membership criteria in her proposed class. For ease of reference, I refer to this "relationship" limit as "family friends."

7

### a. The Proposed Class Lacks Discernible Limits or Membership Criteria.

A class cannot be "discrete" and "limited" unless it is "identifiable." *See Morse*, 132 F.3d at 914 (emphasis added) (noting that in some "situations, requiring the plaintiff to be a part of an *identifiable* and discrete class . . . fits within the purpose of the state-created danger theory."). To be "identifiable," the class must have clearly defined outer boundaries or membership criteria. *See id.* at 913 (emphasis added) (noting that other circuits have accepted a a "discrete class" theory where "state actors creat[e] a risk to a *definable* class of persons."). This requirement makes logical sense: foreseeability is the "primary focus" of the third element, but a class cannot be foreseeable if it is not clearly defined. And a class without clearly discernible limits raises an intolerable risk of bleeding into the "public at large." *Cf. Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676, 688 (D.N.J. 2014) (citing *Morse*, at 913 n.12; *Phillips*, 515 F.3d at 242) ("The purpose of [the discrete class] element is to circumscribe the number of potential plaintiffs stemming from any particular exercise of state authority and shield state actors from liability for any act for which any member of the general public can sue.").

The classes that the Third Circuit has recognized as sufficiently "discrete" consistently feature clearly defined outer limits or membership criteria. *See, e.g.*, *L.R.*, 836 F.3d at 247 (3d Cir. 2016) (kindergarten class "satisfied [the third element] easily"); *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 172 (3d Cir. 2017) (high school's student-athletes formed a sufficiently discrete class where a coach let a football player keep practicing after sustaining a concussion); *Phillips*, 515 F.3d at 229, 242-43 (3d Cir. 2008) (murder victims—a vengeful 911 operator's ex-girlfriend and her current boyfriend—were a foreseeable and discrete class where other operators gave their colleague the victims' addresses and failed to warn them after the operator said he "had nothing left to live for" and would make the victims "pay"); *Walter v. Pike Cnty.*, 544 F.3d

182, 192 (3d Cir. 2008) (murder victim—a private citizen killed by a man whose arrest he participated in—was part of a "discrete class" of those participating in the killer's arrest).

In each of those cases, the defendants would have had no problem identifying who was and was not a member of the class in question. In *Walter*, class membership was finite and capable of precise determination—those participating in the killer's arrest were members while everyone else was not. The same observation applies to the two specific victims in *Phillips*. Likewise, in *Mann* and *L.R.*, the public-school defendants would have known exactly who was and was not a student-athlete or kindergarten-class member.[12]

By contrast, the proposed class here has no clearly defined outer bounds or membership criteria. Hopkins defines that class as "family or friends of [Hill], [who] would have regular contact with him and [who] lived in very close proximity to his home where he was to be released." Am. Compl. at ¶ 26. The Amended Complaint never specifies the scope of the three limits it offers—family or friendship status, "regular contact," and "very close proximity"—and definitional questions abound. For instance, how frequent must interactions with Hill's family (or only those with Hill himself?) be to constitute "regular contact"? Twice a week? Twice a year? How close is "very close proximity?" Within a few blocks of Hill's home? Within a quarter mile? All friends who live in Philadelphia, as opposed to New York or Pittsburgh?

---

[12] The teacher in *L.R.* would need only look to her class list, while the defendants in *Mann* would need only refer to the school's records of who signed up to play sports. For the same reason, the district court cases Hopkins cites that found Pennsylvania foster children as a "discrete class" do not support her position. *See, e.g.*, *D.N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 626 (M.D. Pa. 2009) (finding Pennsylvania foster children to be a discrete class where a police chief hid information that an ex-officer who signed up to be a foster parent liked to watch child pornography); *K.S.S. v. Montgomery Cnty. Bd. Of Comm'rs.*, 871 F. Supp. 2d 389, 401 (E.D. Pa. 2012) (agreeing with *Snyder* that Pennsylvania foster children can be a "discrete class"). Foster children, like the kindergarteners in *L.R.*, are a group with clearly defined criteria of membership and outer boundaries. A foster child either is or is not part of the state's foster-care system. Any state defendant can immediately determine the contours of that class. By contrast, a defendant could not determine membership in Hopkins's proposed class until first divining the meaning of her undefined, proposed limits—"friendship," "close proximity," and "regular contact."

The answers to these questions could vastly expand or shrink the size of the class membership. And even if some of those ambiguities can be cured with more specific pleading,[13] one unanswerable question looms large: what counts as a "family friend?" That term is so inherently speculative and subjective that it appears impossible to define it in a way that lets an unacquainted defendant foresee who does and does not fall within its coverage.[14]

For over a century, courts interpreting a separate body of law—trusts and estates—have faced an analogous problem and reached a similar conclusion about the term "friends." In that context, gifts to a "class" of beneficiaries fail unless the class is "reasonably certain as to membership." *See* GEORGE GLEASON BOGERT, ET. AL., BOGERT'S TRUSTS AND TRUSTEES §162 (June 2019). Courts have consistently struck down classes defined as "my friends" or "friends and family" as too indefinite to be enforceable. *See, e.g.*, *Sheedy v. Roach*, 124 Mass. 472, 477 (Mass. 1877) (finding a gift to "relatives and friends" too vague to be enforceable); *Clark v. Campbell*, 133 A. 166, 170-71 (N.H. 1926) (holding the same for a gift to testator's "friends"); *U.S. Trust Co. of Newark v. Montclair Trust Co.*, 33 A.2d 901, 904 (N.J. Ch. 1943) (holding the same, reasoning that a bequest to "relatives and friends" creates an "unlimited group" because the "word 'friends' has no precise meaning."). The New Hampshire Supreme Court's oft-cited explanation for those rejections applies just as well to this case:

> The word 'friends' . . . has no accepted statutory or other controlling limitations, and in fact has no precise sense at all. Friendship is a word of broad and varied application. It is commonly used to describe the undefinable relationships which

---

[13] Note, however, that even if the terms "very close proximity" and "regular contact" were specifically defined, they still may be insufficient limits on their own, as discussed in Section III.A.1.b.

[14] *Cf.* Mitchell A. Agee, *Friends in Low Places: How The Law Should Treat Friends in Insider Trading Cases*, 7 CHARLESTON L. REV. 345, 372 n.177 (2013) (citations and internal quotation marks omitted) ("Although the word 'friend' appears to have a common-sense meaning, in practice, there is no agreement about precisely what is meant or how that term should be used. Some people describe their spouse or partner as a friend. Some reserve the word 'friend' for a way to include all those whom they know well enough to call by their first name.").

exist . . . between strangers . . . and which vary in degree from the greatest intimacy to an acquaintance.

*Campbell*, 133 A. at 170.[15]

Cases like *Campbell* asked the same question raised here: whether a proposed class is sufficiently defined to let a third party (there, a trustee or estate administrator, here, a state defendant) discern its membership. With this proposed class, the answer must be "no." The phrase here—"family friend"—is likely even *more* expansive and unpredictable than it would be in defining gifts from a single testator or settlor to his or her friends. In those cases, only one indefinable set of friends is at stake. Here, the proposed class could include each "friend" of every one of Hill's family members. As noted with the "regular contact" and "close proximity" limits above, the term "friend" also allows for a vast disparity in class size depending on how it is defined. What is to stop the term from covering, say, all Facebook "friends" of Hill's family members?[16] Would all friendly members of a family's church, synagogue, or mosque count as "family friends?" If the answer is "yes" to either question, the proposed class begins to look no different from the public at large. There is no way to definitively answer those questions, nor is there any way for an unacquainted state defendant to begin to evaluate what criteria may apply.

---

[15] Tellingly, while older editions of Black's Law Dictionary used to borrow *Campbell's* description of the term "friend," more recent editions have abandoned all attempts to define the word. *See* Agee, *Friends in Low Places*, *supra* n. 15, at 372 & n. 178 (noting that "[t]he term 'friend' is ambiguous and even dictionaries fail to define the word," citing Black's Law Dictionary as an example).

[16] *Cf. Law Offices of Herssein & Herssein, P.A. v. United Servs. Auto. Ass'n.*, 271 So. 3d 889, 894 (Fla. 2018) (citing the discussions of "friend" in *Campbell* and Black's Law Dictionary to reject a litigant's motion to disqualify a judge for being Facebook friends with another litigant, reasoning that "friendship exists on a broad spectrum" that is hard to define).

In short, a class with elastic boundaries is not "foreseeable." In an inquiry where foreseeability is the primary focus, that defect prevents recovery.[17]

### b. The Proposed Class Did Not Face a "Special Harm" Separate From That Faced By the General Public.

Along with the definitional problems discussed above, Hopkins also fails to allege that Hill's release posed a "special harm" to the proposed class that was different from the harm his released posed to the general public.

A "discrete class" must face a "particular threat" separate from that shared by the general public. *Commonwealth Bank & Trust Co. v. Russell*, 825 F.2d 12, 16 (3d Cir. 1987); *see also Morse*, 132 F.3d at 912 n.12 (noting that a state's creation of a "danger towards the public generally" is not actionable, but that actions "affecting only a limited group of potential plaintiffs" may be); *Martinez v. California*, 444 U.S. 277, 279, 285 (1980) (emphasis added) (finding a parole board not liable under § 1983 for recommending the release of a "Mentally Disordered Sex Offender" who later killed a teenage girl, reasoning that the "parole board was not aware that [decedent], as distinguished from the public at large, faced any *special danger*.").

---

[17] The implications of Hopkins's position provide another reason to reject liability in this context. Her position would make mental health workers at prisons and confinement centers liable whenever one of their released patients commits a crime similar to that which caused their original confinement. And that liability would extend to the indefinable number of "family friends" of each such released patient. That would create a vast and uncertain scope of liability that undermines the purpose of the "discrete class" requirement—which operates as a limit that prevents the state-created danger exception from swallowing the general rule that the government has no duty to prevent one private citizen from harming another. *Cf. Morrow*, 719 F.3d at 178 (3d Cir. 2013) (rejecting a reading of the "affirmative action" element that would make the "state-created danger *exception* swallow the rule"). And if Hopkins's theory of liability were accepted, it could potentially create problematic incentives for mental health workers to recommend indefinite or extended detention of juveniles to avoid liability to an unpredictable and potentially expansive segment of the general public. *Cf. id.* at 178 n. 19 (agreeing with Judge Ambro's "forceful point" in concurrence that "creating a constitutional tort out of a school's failure to expel a student creates a too-easy incentive for schools to expel quickly students . . . in order to avoid liability or the threat of suit").

The Amended Complaint repeatedly frames Hill's release as creating a danger applicable to the general public. It asserts, among other things, that Hill's release would endanger "the community," "children" in general, and the "public at large."[18] Hopkins therefore asserts that the Defendants created the same type of harm to the public—the increased risk of a violent sexual assault—as that faced by her proposed class. The only way to distinguish the class from the public would be to accept the argument that the class members had a higher chance of being harmed because Hill would more frequently interact with them than he would with other members of the public.

But courts have repeatedly rejected that logic. It arises most frequently in cases where the plaintiff alleges—like Hopkins does here—that he or she is part of a discrete class whose proximity to the state-created danger separates it from the general public. For instance, in *Russell*, 825 F.2d at 13 (3d Cir. 1986), an escaped prisoner killed two people who lived near a jail. The victims' estates sued under § 1983 and argued that the prison's negligence created an immediate threat to those who resided "in the community surrounding the jail." *Id.* at 16. The Third Circuit rejected that argument, reasoning that "residents in the communities surrounding the jail are part of the 'public at large'" and faced no "special danger." *Id.*; *see also Long v. Cnty. of Armstrong*, 679 Fed. App'x. 221, 222, 224 & n.5 (3d Cir. 2017) (rejecting the argument

---

[18] At least eight different paragraphs in the Amended Complaint frame Hill's release as creating a broadly applicable threat to the "public," "community," or "children." *See* Am. Compl. at ¶ 2 (alleging that Defendants ""disregard[ed] . . . the health and well being of the public at large" in recommending Hill's release, and that their "fail[ure] to inform the public" of Hill's dangerous propensities gave him the chance to attack C.A.); *id.* at ¶ 5 (alleging that Yesser failed to keep Hill confined until "the public was no longer in danger of him"); *id.* at ¶ 23 ("Prior to [Hill's release, Defendants] knew that he was a danger to the public . . . ."); *id.* at ¶ 24 (alleging that it was foreseeable that Hill's release would "threaten[] the safety of the community"); *id.* at ¶ 31 (alleging that Defendants "knew . . . about the danger [Hill] posed to children"); *id.* at ¶ 47 (asserting that Defendants created an opportunity for C.A.'s assault by recommending Hill's release with "no warning to the public"); *id.* at ¶ 50 (again emphasizing the failure to "warn or otherwise notify any of the public of [Hill's] release"); *id.* at ¶ 57 (arguing that Defendants violated a state-law duty to keep Hill in custody until he was "no[] longer a risk to the public.").

that a victim—a woman killed by a prisoner who escaped from a jail less than a quarter-mile from her home—was part of a "limited, discrete class" of residents who lived within "eyeshot" or the "immediate vicinity" of the jail, concluding that these limits could not distinguish the class from the public at large); *Henry v. Adult Prob. and Parole Dep't.*, No. 05-4809, 2007 WL 2670140, at *2, *7-8 (E.D. Pa., Sep. 6, 2007) (holding that plaintiffs—a fifteen year-old and her father killed by an inmate placed on house arrest—were a part of the "general public," rejecting the argument that they were part of a "discrete class" of those living within three miles and ten minutes of the inmate's house); *Twp. of West Orange v. Whitman*, 8 F. Supp. 2d 408, 422 (D.N.J. 1998) (holding that plaintiffs' proposed "discrete class"—residents in the neighborhoods "immediately surrounding" group homes for people with mental illnesses—could not be distinguished from the public at large).

In *Russell*, *Long*, *Henry* and *Whitman*, it was undoubtedly true that the plaintiffs lived closer to—and thus faced a higher chance of encountering—the potential harm than other members of the public. But that difference alone was insufficient because both groups faced the *same kind* of danger: the risk that an escaped prisoner or resident would commit an act of violence. The same is true here. Hopkins expressly alleges that the public faced the same danger as that faced by her proposed class—the risk that Hill, once released, would commit a violent sexual assault. The only way to distinguish the latter from the former is to rehash the same kind of "proximity" rationale found insufficient above: that the proposed class has more frequent contact with Hill than people situated further away, and therefore faces a "distinct harm."[19] That kind of reasoning is unpersuasive. *Cf. Long v. Armstrong Cnty.*, 189 F. Supp. 3d

---

[19] In her briefing, Hopkins also argues that her proposed class is distinct from the public because Manfredi and Yesser knew that Hill specifically intended to target young family friends upon his release. *See, e.g.*, Pl.'s Resp. to Yesser's Mot. to Dismiss, at 14-15 (ECF 33) (arguing that *Long* is distinguishable because there, unlike here, there were "no allegations that the inmate had told officials at the prison that

14

502, 511 (W.D. Pa. 2016) ("[T]he 'public in general' rule already internalizes [and rejects as insufficient] the argument that those living closer to an alleged state-created danger face a higher probability of harm than those living elsewhere."); *Jones v. Reynolds*, 438 F.3d 685, 697 (6th Cir. 2006) (citation and internal quotation marks omitted) ("A plaintiff cannot merely . . . name a more particular sub-class of the public as the group to which the government owed a duty, such as one's 'neighbors.' Neighbors are still the public.").

In sum, there are three proposed limits in the proffered class: (1) family friend status, (2) "close proximity," and (3) "regular contact." The first provides an unworkably malleable limit because the term "family friend" is incapable of clear definition. The second and third repeat the same kind of "proximity" rationale rejected in the cases discussed above. Accordingly, because Hopkins fails to adequately allege the third element of the state-created danger theory, I will dismiss her substantive due process claim.

## B. State-Law Negligence Claims

In addition to dismissing the § 1983 claim against Yesser and the Manfredi Defendants, I will also decline to retain supplemental jurisdiction over the state-law tort claims Hopkins brings against Yesser, Manfredi, BMA, and Hill.

Under 28 U.S.C. § 1367(c)(3), a district court has discretion to decline to exercise supplemental jurisdiction over state-law claims if it has dismissed all claims over which it had original jurisdiction. And if the court has dismissed all claims creating original jurisdiction, it

---

he intended to murder" the victim "if he got out," whereas "Plaintiff has alleged . . . that [Hill] intended to sexually assault a young family friend when he was released . . . and [that Defendants] were aware of [Hill's] intention."). But the Amended Complaint never mentions anything about Hill's specific intent or Defendants' awareness of that intent. And even if it did, alleging a specific intent as to the proposed class would not fix the problem noted in the prior section: that "family friend" is incapable of clear definition. Because Hopkins never alleges or subsequently argues that Hill specifically intended to target *C.A. specifically*, I do not address whether that allegation would change the analysis.

"must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995) (citations omitted). There is no affirmative justification for retaining jurisdiction over Hopkins's state law claims against any of the Defendants. I will therefore dismiss those claims—the negligence claim against Yesser and the Manfredi Defendants, as well as the intentional tort claims against Hill—without prejudice to their re-filing in state court.

## IV. CONCLUSION

For the reasons set forth above, I will dismiss all of Hopkins's § 1983 and state-law tort claims.

                                                  **s/Anita B. Brody**

                                                  ANITA B. BRODY, J.

Copies **VIA ECF** 9/24/2019        Copies via U.S. Mail 9/24/2019

                                                      Jamir Hill, NC-2292, SSI Pine Grove,

                                                      189 Fyock Rd, Indiana PA 15701